STATE OF MONTANA EX REL. C. B. NOLAN, ATTORNEY GENERAL, PLAINTIFF, *v.* THE MONTANA RAILWAY CO. AND THE BUTTE, ANACONDA & PACIFIC RAILWAY CO., DEFENDANTS.

[Submitted June 7, 1898. Decided June 20, 1898.]

*Railroads—Power to Lease—Consolidation of—Parallel and Competing Roads.*

1. One railroad company cannot lease its road to another company unless the legislature has given it power so to do.
2. Section 923 of the Civil Code (Act of March 4, 1893,) which was continued in force after the adoption of the Code by Section 5186 Political Code, repeals Sections 911 and 912, so far as these latter sections limit the right of railroad companies to lease their roads to one another to such companies as are not parallel or competing roads.

3. Under Section 923 of the Civil Code, one railroad company can lease its road to a parallel and competing road for a term of ten years. Such a lease is not a consolidation of the two roads, within the meaning of Section 6, Article 15 of the State Constitution.

4. *Held*, by a majority of the Court, that although two railroad companies have but one common terminus, nevertheless, when by traffic arrangement with other roads they are brought into competition between common terminal points, they are competing roads within the meaning of Section 6, Article 15 of the Constitution.

ORIGINAL PROCEEDING by the State of Montana, at the relation of C. B. Nolan, attorney general, against the Montana Railway Company and the Butte, Anaconda & Pacific Railway Company, corporations. Petition denied.

*C. B. Nolan, Attorney General,* for the State.

Citing Section 6, Article 15, of the State Constitution; Sections 912 and 923, Civil Code; Beach on Railways, Section 535; *State* v. *Atchison Railway Co.*, 24 Neb. 143; *Langdon* v. *Branch*, 37 Fed. 463.

*W. W. Dixon, William Scallon* and *William H. De Witt,* for Defendants.

(After citing other cases and statutes.) Therefore we enter upon the main discussion of this case with the preliminary proposition established that section 923 is the law applicable to the subject, and gives to the Montana Railway Company and the Butte, Anaconda & Pacific Railway Company the right to enter into this lease. This is a direct legislative authority granting the power to make the lease, and meets the decisions in the cases which hold that such power must be granted by statute. (*Louisville & Nashville Ry. Co.* v. *Kentucky*, 116 U. S. 692; 75th Texas, 434; *St. Louis, V. & T. H. R. Co.* v. *Terre Haute*, 145 U. S. 393; *Thomas* v. *Ry. Co.*, 101 U. S. 71; *Penn. Co.* v. *Ry. Co.*, 118 U. S. 290; *O. R. & N.* v. *Ry. Co.*, 130 U. S. 1; *Cent. Tp. Co.* v. *Car Co.*, 139 U. S. 24, 45, 54; *St. Louis Co.* v. *Ry. Co.*, 145 U. S. 395, 402; *L. & N. Co.* v. *Kentucky*, 161 U. S. 677; Rees on Ultra Vires, § 137; 1 Stimson's Am. St. Law, § 467, p. 107. Counsel also contended "that a 'leasing' is not a 'consolida-

tion' and is not included in that term," citing *Louisville & N. R. Co. v. Kentucky*, 161 U. S. 690; *Gere v. N. Y. Central & Hudson River R. R. Co.*, 19 Abbott's New Cases, 202; *Mills v. Central R. R. Co.*, 41 N. J. Eq. 1; *Mackintosh v. Flint, etc., R. R. Co.*, 34 Fed. 582; Hirschl on Corporations, p. 40; *Elkins v. Camden & Atlantic R. R. Co.*, 36 N. J. Eq. 1; *Board of Coms. v. R. R. Co.*, 50 Ind. 110; Thompson on Corporations, § 5891; 3 Amer. and Eng. Enc. of Law, p. 825; *St. L. V. & T. H. R. Co. v. The Terre Haute & Ind. R. Co.*, 145 U. S. 393; *Archer v. Railway Co.*, 102 Ill. 493; *Pa. etc. Co. v. Ry. Co.*, 118 U. S. 290.) The question of what is a competing line has been the subject of consideration in quite a number of decided cases, in jurisdictions where the question is an open one; for in some states the constitution itself declares that the question is one for the jury, as in Pennsylvania, Missouri and Arkansas. (1 Stimson's Am. St. Law, § 467, p. 108.) But in the case at bar the court is the jury, as all the facts are admitted. But it is, in nearly all, if not all, cases, treated as a question of fact; and in some cases it has been held to be a fact of which the court will take judicial notice from the geographical situation. (*Ry. Co. v. State*, 10 S. W. 81, 83 (Tex.); *Ry. Co. v. Ry. Co.*, 35 Atl. 952 (Penn.); *Hager v. Ry. Co.*, 4 O. D. L. 487, 29 Wkly L. B. 68 (Ohio); *Kimball v. Ry. Co.* 46 Fed. 888; 6 Am. and Eng. Enc. Law (2nd Ed.), p. 826; *State v. Vanderbilt*, 37 O. St. 590; 8 Am. and Eng. Ry. Cas. 657; *L. & N. Ry. Co. v. Kentucky*, 161 U. S. 677, 691; *Gulf, etc. v. State*, 10 S. W. (Tex.) 81, 83, distinguishing it from the case of *Railway Co. v. Rushing*, 69 Tex. 506, 6 S. W. 834; *Cumberland, etc., Ry. v. Gettysburg, etc., Ry. Co.*, 35 Atl. 952; *Kimball v. Ry. Co.*, 46 Fed. 888; *Louisville & Nashville Ry. v. Kentucky*, 161 U. S. 677.)

HUNT, J. The attorney general has instituted this proceeding as an original one in this court, to have declared invalid and of no force and effect a certain contract of lease entered into between the Montana Railway Company and the

Butte, Anaconda & Pacific Railway Company. Both of these ralroad corporations are organized under the laws of this state, and operate railroads within Montana. The terms of the lease are substantially as follows: The Montana Railway Company leases to the Butte, Anaconda & Pacific Railway Company all the railway, including lands, right of way, buildings, tracks, turntables, yards, and all real property pertaining thereto lying between Stuart Junction and Anaconda, in the county of Deer Lodge. The lease is to commence May 1, 1898, and to run ten years. The Butte, Anaconda & Pacific Railway Company agrees to pay to the Montana Railway Company an annual rental of $25,000 in monthly installments. The Butte, Anaconda & Pacific Railway company covenants to keep the leased premises, including the tracks and all property pertaining thereto, in as good condition as the same were at the time the lease became effective. It is provided that the leased property shall at all tin cs be operated by the Butte, Anaconda & Pacific Company in accordance with its charter and the laws, and all responsibilities of such operation shall be assumed by the lessee. The Montana Railway Company and the Northern Pacific Railway Company are to be at all times held harmless by the lessee for all acts or omissions that may occur in the operation of said property, except when the Northern Pacific Railway Company runs its own trains over the track of the Montana Railway Company, in which case the lessee is not to be responsible for accidents unless due to the defective track or negligence of the employees of the lessee. The Butte, Anaconda & Pacific Company covenants to pay all expenses of operation and maintenance of the leased property, and all taxes and assessments during the period of the lease. The Butte, Anaconda & Pacific company further covenants that the business of the Oregon Short Line Company, between Anaconda and all points reached by said Short Line, or by way of the same, shall at all times be handled upon as favorable terms as are accorded to any other line, and that no discrimination shall be made against the business of the Oregon Short Line, either in facilities accorded to it or the rates charged it, as compared

with any other line doing business in Anaconda which passes over the Butte, Anaconda & Pacific tracks. All freight business to and from points east of Butte reached by the Northern Pacific Railway destined to or from Anaconda is to be interchanged at Butte between the Northern Pacific Railway Company and the Butte, Anaconda & Pacific Railway Company, and the division of the revenues shall at no time during the continuance of the lease exceed the Butte, Anaconda & Pacific Company's divisions now effective between the Butte, Anaconda & Pacific Company and the Montana Central Railway Company, and shall at all times be as favorable to the Northern Pacific as to the Montana Central or Great Northern Railway Companies. The Northern Pacific is to have the right to run passenger trains to and from points east of Butte over the leased line between Stuart and Anaconda. Upon all joint business handled upon such trains the revenues shall be divided, and the division allotted the Butte, Anaconda & Pacific Company upon competitive business shall be the local fares of the Butte, Anaconda & Pacific Company from Butte to Anaconda, and upon noncompetitive business shall be the local fares from Stuart to Anaconda, as the same may be established from time to time, but at no time in excess of those existing at the time this lease becomes effective. . The Butte, Anaconda & Pacific Company shall be entitled to receive all the local passenger fares received or collected on such Northern Pacific trains upon such leased line, or for tickets or passenger fares thereon between Butte and Anaconda. In consideration therefor no charge is to be made by the Butte, Anaconda & Pacific company for the use of the leased tracks, or the facilities for the passenger business from Stuart to Anaconda, except the fares of passengers as provided in the lease. Upon all joint freight business to and from stations upon the Northern Pacific Railroad or its connections west of Helena, Mont., to be interchanged at Stuart, the Butte, Anaconda & Pacific shall be allowed on carload freight $3.50 per carload, and upon less than carload 3 cents per 100 pounds; and upon passenger business its local fare, but not at any time in excess

of 45 cents per passenger. The lease provides against discrimination against the business of the Montana Union or Northern Pacific Companies, interchanged with the Butte, Anaconda & Pacific Company at Butte or Stuart, or other points of connection, as compared with any other exchange of business existing between the Butte, Anaconda & Pacific Company and any other lines at the same or competing points. It is also agreed by the Northern Pacific that freight, passenger and express rates between its eastern and western terminals and connections and Anaconda shall at all times be no higher than the rates between the same points and Butte, including the divisions agreed upon in the lease, or those allowed the Butte, Anaconda & Pacific Company by other competing lines. Provision is also made for an allowance in case the Northern Pacific should handle passenger or express traffic between Butte, Stuart and Anaconda over the leased premises for its competitors or any other railroads. The lessee is to receive all revenue and pay for all mails carried between Stuart and Anaconda on Northern Pacific trains. The lease contains provisions whereby, if the lessee fails to perform the covenants or obligations of the contract, the lessor may, at its option, terminate the lease, and repossess itself of the leased premises. The contract is also binding upon the successors and assigns of the party bound, and shall inure to the successors and assigns of the party for whose benefit it is made.

The pleadings and stipulations show the following facts: The Montana Union Railroad Company, the Montana Railway Company, and the Butte, Anaconda & Pacific Railway Company are separate corporations, but the stock of the Montana Union and of the Montana Railway Company is controlled by the Northern Pacific Railway Company. The Butte, Anaconda & Pacific line starts from Butte, and runs to the city of Anaconda. For fourteen miles after leaving Butte its course is south; then it runs northwesterly about twelve miles to Anaconda. The Montana Union runs from Butte to Garrison, a station on the Northern Pacific main line. It practically parallels the Butte, Anaconda & Pacific for a distance of fourteen

miles; that is to say, from Butte towards Anaconda the lines are parallel for a distance of fourteen miles. About three miles north of where the lines of the Montana Union and the Butte, Anaconda & Pacific diverge is the station of Stuart, on the main line of the Montana Union. The Montana Railway Company's line runs from Stuart to Anaconda in a north-north-northwesterly direction. The Montana Railway and the Butte, Anaconda & Pacific have one common terminus—the city of Anaconda. Their other termini are Stuart, for the Montana Railway Co., and Butte, for the Butte, Anaconda & Pacific. Stuart, a terminus of the Montana Railway Company, is from two and a half to three miles from the nearest point on the Butte, Anaconda & Pacific line. For several months prior to May 1, 1898, the Montana Railway was temporarily operated by the Northern Pacific, but on May 1st it leased its line between Anaconda and Stuart to the Butte, Anaconda & Pacific Company, as heretofore stated.

It is admitted that the Montana Railway and the Butte, Anaconda & Pacific lines are connected at Anaconda, and that the shortest route from the city of Butte via Anaconda to Stuart, and stations on the Montana Union Railroad north of Stuart, and all stations on the Northern Pacific main line, is by way of the Butte, Anaconda & Pacific to Anaconda, and from Anaconda to Stuart by the Montana Railway, and from Stuart northerly on the Montana Union to points along the lines of the Montana Union and Northern Pacific. It is also admitted that the Butte, Anaconda & Pacific Company each day runs continuous trains over the route just described, and intends to continue to run such trains.

The proposition advanced by the attorney general is that the Butte, Anaconda & Pacific Railway and the Montana Railway lines are parallel and competing, and that for that reason the lease of the Montana Railway to the Butte, Anaconda & Pacific Company is prohibited by the constitution, and *ultra vires* of the corporation. On the other hand the defendants insist—first, that the facts establish that the above-mentioned lines of railway are not parallel or competing, and are con-

tinuous and connected; second, that, if the proposition just
stated is not tenable, still the lease is valid, and but the exer-
cise of the powers granted to the aforesaid corporations by
the laws of Montana under which they are organized, and not
in conflict with the constitution.

It can be safely stated that, unless the legislature has given
to the corporations here interested the right to lease, the
power does not exist.  This principle is now firmly estab-
lished by the Supreme Court of the United States, having
been laid down by Justice Miller, for the court, in *Thomas v.
Railroad Co.*, 101 U. S. 71, in the following words:  "We
take the general doctrine to be in this country, though there
may be exceptional cases and some authorities to the contrary,
that the powers of corporations organized under legislative
statutes are such and such only, as those statutes confer.
Conceding the rule applicable to all statutes—that what is
fairly implied is as much granted as what is expressed—it re-
mains that a charter of a corporation is the measure of its
powers, and that the enumeration of these powers implies the
exclusion of all others."  We are, therefore, brought to in-
quire where the consent is to be found.  In considering this
question, it becomes necessary to examine the constitution of
the state and the statutes, and then to observe their relation
to the general subject under consideration, and to one another.

Cutting out of the controlling constitutional provision lan-
guage not material to railroad corporations, we have the fol-
lowing clause:  "No railroad corporation, or the lessees or
managers thereof, shall consolidate its stock, property or
franchise, with any other railroad corporation, owning or hav-
ing under its control a parallel or competing line; neither
shall it in any manner unite its business or earnings with the
business or earnings of any other railroad corporation, nor
shall any officer of such railroad company act as an officer of
any other railroad company owning or having control of a
parallel or competing line.  (Article XV, Sec. 6, Constitution
of Montana.)

Turning to the statutes, we find that the legislature adopted

Sections 911, 912, and 913 of the Civil Code at the time of the adoption of the codes.

Section 911 authorizes any two or more railroad corporations whose respective lines not being parallel or competing lines, are wholly or partly within this state, when their respective lines of road, or any branch thereof, so connect within this state that they may operate together as one property, to consolidate their capital stock, franchises and pioperty, and thereby to become one corporation by any name adopted, which may be that of one of them, upon such terms and conditions as may be agreed upon by the corporations in the manner provided by the statutes.

Section 912 provides that any railroad corporation whose line is wholly or partly within Montana, or reaches the boundary lines thereof, whether organized under the laws of Montana or of the United States, or of any other state or territory, may lease or purchase the whole or any part of the railroad or line of railroad of any railroad corporation, together with all the rights, powers, immunities, franchises, etc., provided the railroad or line of railroad so leased or purchased is continuous or connected with its own line, and not a parallel or competing line.

Section 913 provides that any railroad corporation organized as in the preceding sections shall have authority to negotiate and deliver its bonds, securities, or obligations, and negotiate the same in such manner as the board of directors may authorize or determine, and to secure the payment of such bonds the corporation may execute and deliver such mortgages or deeds of trust upon all or any part of its property as the directors may determine; and, if any such mortgage shall so provide, it shall be and remain a valid lien upon the property of the corporation irrespective of the law relating to chattel mortgages, and such mortgage shall be taken, held, and enforced as are mortgages of real estate.

The foregoing statutes intended to give, and did give— first, a complete power of consolidation, by which a corporation formed by a consolidation should be a corporation suc-

ceeding to and having, owning, and exercising all the powers, rights, franchises, and immunites possessed by the corporations consolidated into one, provided the consolidating corporations were not parallel or competing; second, an equally adequate power, whereby one railroad corporation could lease or purchase the whole or any part of another railroad corporation's property, together with its rights and franchises, provided the leased or purchased railroad was continuous or connected with its own line, and was not parallel or competing; third, a further general power to any railroad corporation to issue bonds and mortgage its property. If the statutes just cited were in force and were the only ones in force, the questions necessary to be determined in this case would be simply whether or not the Montana Railway is continuous or connected with the Butte, Anaconda & Pacific, and whether the Butte, Anaconda & Pacific and the Montana railways are competing and parallel. If those questions were answered affirmatively, clearly the power necessary to authorize the lease under examination is denied by the inhibitory language of the constitution.

But we must go further, and consider another section of the statutes. By an act approved March 4, 1893, (Third Session Laws, p. 157) and especially preserved and continued in force by Section 5186 of the Political Code, approved March 13, 1895, the legislature provided as follows: "Any railroad company now or hereafter incorporated pursuant to the laws of this state or of the United States, or of any state or territory of the United States, may at any time by means of subscription to the capital stock of any other railroad company, or by the purchase of its stock or bonds, or by guaranteeing its bonds, or otherwise, aid such company in the construction of its railroad within or without this state; and any company owning or operating a railroad within this state may extend the same into any other state or territory, and may build, buy, lease, or may consolidate with any railroad or railroads in such other state or territory, or with any other railroad in this state, and may operate the same, and may own such real

estate and other property in such other state, or territory as may be necessary or convenient in the operation of such road; or any railroad company may sell or lease the whole or any part of its railroad or branches within this state, constructed or to be constructed, together with all property and rights, privileges and franchises pertaining thereto, to any railroad company organized or existing pursuant to the laws of the United States, or of this state, or of any other state or territory of the United States; or any railroad company incorporated or existing under the laws of the United States, or of any state or territory of the United States, may extend, construct, maintain and operate its railroad, or any portion or branch thereof, into and through this state, and may build branches from any point, or such extension to any place or places within this state; and the railroad company of any other state or territory of the United States which shall so purchase or lease a railroad, or any part thereof in this state, or shall extend or construct its road or any portion or branch thereof in this state, shall possess and may exercise and enjoy, as to the control, management and operation of the said road, and as to the location, construction and operation of any extension or branch thereof, all the rights, powers, privileges and franchises possessed by railroad corporations organized under the laws of this state, including the exercise of the power of eminent domain.   Such purchase, sale, consolidation with, or lease may be made, or such aid furnished upon such terms or conditions as may be agreed upon by the directors or trustees of the respective companies; but the same shall be approved or ratified by persons holding or representing a majority in amount of the capital stock of each of such companies, respectively, at any annual stockholders' meeting or at a special meeting of the stockholders called for that purpose, or by approval in writing of a majority in interest of the stockholders of each company respectively; provided that nothing in the foregoing provisions shall be held or construed as curtailing the right of this state, or the counties through which any such road or roads may be located, to levy and col-

lect taxes upon the same and upon the rolling stock thereof, in conformity with the provisions of the laws of this state upon that subject; and all roads or branches thereof in this state, so consolidated with, purchased or leased, or aided and extended into the state, shall be subject to taxation and to regulation and control by the laws of this state, in all respects the same as if constructed by corporations organized under the laws of this state; and any corporation of another state or territory, or of the United States, being the purchaser or lessee of a railroad within this state, or extending its railroad or any portion thereof into or through this state, shall establish and maintain an office or offices in this state at some point or points on its line at which legal process and notice may be served, as upon railroad corporations of this state; provided further, that before any railroad corporation organized under the laws of any other state or territory of the United States shall be permitted to avail itself of the benefits of this act, such corporation shall file with the secretary of state a true copy of its charter or articles of incorporation.    (Section 923, Civil Code.)

There are manifest and numerous irreconcilable inconsistencies between this last section quoted and sections 911 and 912.    Although all three statutes refer to the general subject of consolidation, purchasing, and leasing of railroads by other railroad corporations, the method of procedure to effect a consolidation is different, and restrictions expressly included within the provisions of sections 911 and 912, not necessary to be here set forth in detail, are not found in section 923. But, as more conspicuous than other differences, it is noticeable that in 923 the right to consolidate, lease, or buy is granted without regard to whether or not the railroads owned by the contracting parties are parallel or competing, or continuous or connected.    The later statute was a radical departure from a previous legislative policy.    It may be this departure arose by reason of considerations which led the legislature to believe that principles of public policy do not invalidate reasonable traffic arrangements between lines of railway

whereby one railroad corporation may lease for a reasonable period of time an independently incorporated short line, which is a spur or feeder of still another and more important line; and that on this account they were led to authorize in express terms such agreements, even though the leased line is a link which by its connections becomes a competing line. They had a right, subject to the limitations of the constitution, to adopt a policy less restricted than that which had been recommended by the code commissioners, or established by their own action just previously taken; and it is not for the court to determine the wisdom of a policy underlying laws which have resulted from changed opinions of the lawmaking body. It is far more likely, however, that the peculiar condition presented really arose by the difference of views between the code commissioners who reported the Civil Code in 1892 and the several legislatures which met after the report of that commission, and before the adoption of the Codes as reported. It appears that sections 555 and 556 of the Civil Code, as reported by the code commission, were adopted February 19, 1895, when the Civil Code was adopted, as sections 911 and 912 of that Code. The legislature, for convenience sake, passed the whole Code substantially as reported, and then proceeded to amend or revise the Code as passed. But between the time of the report of the code commission and the adoption of the Codes, the legislative session of 1893 occurred, and it was then that section 923 was enacted. Thereafter came the session of 1895, whereat a preserving act (Political Code, Section 5186) was passed after the adoption of the Codes. This preserving act specially continued in force section 923. Applying now the rules of construction laid down in the case of *State* v. *Rotwitt*, 17 Mont. 41, 41 Pac. 1004; *Steele* v. *Gilpatrick*, 18 Mont. 453, 45 Pac. 1089; *Proctor* v. *Cascade Co.*, 20 Mont. 315, 50 Pac. 1017—it is our opinion that the intent of the legislature was to cover the whole subject of delegating the power to railroad corporations to consolidate, lease, and purchase by section 923, and in this respect to revise and repeal the provisions of sections 911 and 912. So far, therefore, as the

power is involved, section 923 displaced and repealed all former laws upon that subject. Whether a certain manner of procedure laid down in section 911 is yet in force, we need not here inquire.

Proceeding, then, the case comes to this: If the law (section 923) is not in conflict with the constitutional section quoted, the Butte, Anaconda & Pacific Company can lease the Montana Railway line irrespective of all questions of competition or parallelism. We now speak of leasing only, because the power to consolidate, although expressly given by section 923, obviously can only be exercised in a constitutional manner; that is, by railroad corporations not owning or having under their control parallel or competing lines. The language of the constitution in respect to consolidation is too plain to require any argument on that point. No one could seriously contend that, if the railroad corporations, parties to the lease in question, are parallel or competing, they can consolidate into one resultant corporation, directly or indirectly. Section 923 is to be read as merely authorizing the amalgamation or consolidation of railroads not forbidden to amalgamate or consolidate by the constitution. (Cooley's Constitutional Limitation, 218.)

The correctness or applicability of these rules of construction is not seriously controverted, we take it, by the attorney general. There is, therefore, authority in the railroad corporations concerned in this suit to make the contract of lease under section 923, unless such authority is denied under the constitution, for the reason that the lines involved are parallel or competing lines, and that the lease between them is a consolidation of one with the other.

We now directly meet the recurrent questions: Are the roads of the Butte, Anaconda & Pacific and the Montana Railway Companies parallel or competing lines, and, if they are, may they contract by lease ? The true rule is that whether two railroads are parallel or competing is a question of fact— of physical fact. Actual mathematical parallelism is easily demonstrable by engineers' maps of surveys and calculations.

Exact parallelism, however, is not what is included in the meaning of the words of the constitution forbidding consolidation of parallel railroads.  A reasonable construction must obtain.   In a mountainous country it is well nigh impossible to conceive of two railroads running any distance precisely equidistant at all points.   We should say that by parallel railroads are meant railroads running in one general direction, traversing the same section of country, and running within a few miles of one another throughout their respective routes. They may or may not be competing.  That depends upon their termini, and their commands of traffic.  (*L. & N. Railroad Co.* v. *Kentucky*, 161 U. S. 677, 16 Sup. Ct. 714.)

Independently of the Montana Union Railroad, the Montana Railway cannot be said to be a parallel line to the Butte, Anaconda & Pacific between Butte and Anaconda.  One of the principal terminal points of the Montana Railway line is Stuart, on the line of the Montana Union, while one of the principal terminal points of the Butte, Anaconda & Pacific is Butte. Anaconda is the other principal terminal point of each.  From Stuart to Anaconda, though—a distance of about twelve miles —there is a substantial parallelism in their routes.  Still, we think it doubtful whether the Montana Railway is a parallel line of the Butte, Anaconda & Pacific in a sense that would prevent its union with the Butte, Anaconda & Pacific, if such consolidation or union were attempted under the law.

But, passing that question without decision of it, are they competing lines of railway ?  Here again, if we take the separate corporation, the Montana Railway Company, and its railroad line as an independent one, and examine the maps and consider the section through which the roads run, we find there could be no substantial competition with the Butte, Anaconda & Pacific, for the reason that the traffic between Stuart and Anaconda on the Montana Railway, and that point on the Butte, Anaconda & Pacific nearest to Stuart and between such point and Anaconda, and between intermediate points and Anaconda, is entirely insignificant, as there are no towns or freight stations, to furnish·business sufficient to make such

competition along the lines of the two roads between such points and the city of Anaconda. Whether lines of road are competitive or not depends upon the business of the companies, the conduct of the roads by their authorities, their channels of traffic, and generally—nearly always—upon whether the roads extend for transportation from and to the same points along their routes. Strictly speaking, the line of road of the Montana Railway Company consists of the road—the superstructure—over which it operates its trains in the exercise of its franchise, and none other. From an exact standpoint it is limited in its railroad operation to the few miles of rails and other property belonging to its own corporation, inasmuch as it neither controls nor operates other roads by lease, ownership, consolidation, or otherwise. Thus literally regarding the situation, there could be no competition between the Montana Railway and the Butte, Anaconda & Pacific lines.

But a majority of the court prefer to adopt what we think to be a more practical way of looking upon this branch of the case, and to consider the constitution as comprehending by competing lines not only railroads which run between the same two principal points on their own lines, but those which, having one common terminus, yet are actually connected with other railroads, and which, by arrangements with such other railroads concerning the transportation of freight and passengers, are so related to one another in fact as to give them the opportunity by geographical situation to directly cut rates to principal or terminal points. (*E. L. & Red River Railway Co.* v. *State,* 75 Tex. 434, 12 S. W. 690.) To apply this by a plain illustration: A merchant in Anaconda buys his goods at San Francisco. The goods are delivered in transit at Butte. From that point to Anaconda the merchant has a choice of routes, one practically as direct as the other. He may ship over the Butte, Anaconda & Pacific to Anaconda, or over the Montana Union to Stuart, and thence to Anaconda via the Montana Railway route. They are equally convenient and in a situation to underbid one another as to the rates of transportation. Especially is this so in the illustration given, for

the Montana Union and the Montana Railway Companies are both under the control of the Northern Pacific, so that the traffic arrangements as well as other conditions exist whereby the competition can be vigorous and effective. Conditions of fact made apparent by the record and plats before us have, for the reasons given, led a majority of the court to conclude that by its alliance with the Northern Pacific, and its geographical situation, the Montana Railway line is a competing line with the Butte, Anaconda & Pacific between Butte and Anaconda.

Reverting to the constitution, we find no prohibition against a railroad corporation leasing its stock, property, or franchise to any other railroad corporation, or having under its control a parallel or competing line, unless a leasing is a consolidation, or unless there are other parts of Section 6 of Article XV which should be construed as prohibiting such contracts of lease. Many constitutions, in their provisions to guard against all possible contingencies whereby competition between railroads may be interferred with, do prohibit leasing or purchasing, as well as consolidation; others, in terms much like ours, only prohibit consolidation.

As bearing upon the evident policies of several certain states at the dates of their adoption of their respective constitutions, provisions of organic laws as they stood in 1894 upon this subject may be grouped as follows: The following states provide that no railroad corporation, or the lessees, purchasers, or managers of any railroad corporation, shall consolidate the stock, property, or franchises of such corporation with, or lease or purchase the works or franchises of, or control, any other railroad corporation owning or having under its control a parallel or competing line: Arkansas, Sec. 4, Art. XVII, Constitution of 1874; Kentucky, Sec. 201; Missouri, Sec. 17, Art. XII, Constitution of 1875; Pennsylvania, Sec. 4, Art. XVII; Texas, Sec. 5, Art. X.

The following states substantially provide only that no railroad corporation, or the lessees or managers thereof, shall

consolidate its stock, property, or franchises with any other railroad corporation owning, or having under its control, a parallel or competing line: Colorado, Art. XV, Sec. 5, Constitution of 1876; Illinois, Art. XI, Sec. 11; Michigan, Art. XIX, Sec. 2, Constitution of 1850; Nebraska, Sec. 3, Art. XI, Constitution of 1875; Washington, Sec. 16, Art. XII, Constitution of 1889.

The constitutions of North Dakota (Sec. 141, Art. VII, of the Constitution of 1889) and of South Dakota (Sec. 14, Art. XVII, Constitution of 1889) prohibit in identical language the consolidation of the stock, property, or franchises of railroads owning parallel or competing lines, but especially provide that "any attempt to evade the provisions of this section [pertaining to consolidation] by any railroad corporation by lease or otherwise, shall work a forfeiture of its charter." There we have, in effect, a provision against leasing for a long time, if not altogether.

In West Virginia, by Sec. 11, Art. XI of the Constitution of 1872, consolidation or obtaining the possession of parallel or competing lines by lease or other contract is prohibited without the permission of the legislature. The statutes, Sec. 53, p. 532, Code of West Virginia, give these rights, and provide the manner of their exercise.

In Wyoming, Sec. 8, Art. X of the Constitution of 1889, there is simply a general prohibition against consolidation or combination of corporations of any kind to prevent competition. No special clause is found as applicable to railroads or any other class of corporations.

In Georgia Article IV, Part 4, Subdivision 11, of the Constitution denies to the legislature the power to authorize any corporation to make any contract with another corporation "which may have the effect or be intended to have the effect to defeat or lessen competition in the respective businesses or to encourage a monopoly."

In Utah, Sec. 13, Art. XII, Constitution of 1895, consolidation is prohibited with any other railroad "owning a competing line." This utterance is the very latest constitutional

provision, and is noteworthy as not prohibiting leasing or purchasing, or even consolidation, of one road with another which has under its control a competing line or a parallel line.

Comparison between these various constitutional limitations shows that no one is precisely like the prohibition of the Montana constitution. Similarity exists in but one principal respect. Almost every constitution imposes various limitations upon the power of consolidation, and so general is antagonism to the consolidation of competing railroads that, where the constitutions are silent, statutory enactments frequently prevail by which the principle is affirmatively established that there shall be no consolidation of competing railroads. Minnesota, Sec. 2716, St. 1894; Arizona, Sec. 318; New Hampshire, Gen. St. p. 377, Sec. 11; New York, Laws 1869, ch. 917, Sec. 9; North Carolina, Battle's R. S., p. 751, (65); Wisconsin, Rev. St. Sec. 1833. In Florida, Sec. 2248, St. 1892, parallel or competing roads may not consolidate except by consent of the railroad commission. Other states, by withholding the power to consolidate, prohibit the exercise of it.

Conforming to this general policy, Montana has by no uncertain language aligned herself with her older sister states, where experience has demonstrated that the merger of two competing railroads into one is apt to result in stifling free competition, and hence is disadvantageous to the well-being of the state. Sufficient demonstration of this proposition consists in the statement that great accumulations of property in the hands of any corporate power, likely to hold on to such accumulations, are dangerous to public welfare. The life of an individual is too limited to render such dangers very great where tremendous wealth is in his hands, but a corporation seldom feels that the bounds of human life, or even of its own chartered existence, should too closely circumscribe its actions. Restraints by limitations upon and within their grants of powers are necessary, lest they may become much too strong for society.

If, for instance, consolidation were allowed with no bounds of restraint, a railroad's possessions might become a colossal

enterprise owning all means of transportation within a state. Without rivalry of railroads, monopolies might grow up, and, to bring the dangers of destroying competition before us, that remarkable progress which this young state has made in its healthy development could be stayed by the consolidation or amalgamation of railroad corporations owning competing lines. The maxim, "Competition is the life of trade," forms the base of the constitutional prohibition against consolidation of rival railroads, and whatever consolidation does include within its meaning is absolutely illegal and void.

What is a consolidation of one railroad corporation with another? Rorer on Railroads p. 588, thus defines it: "The consolidation of two or more railroad corporations is the permanent union of their interests, management, and control, either in the formation of a new company out of the consolidated ones, or else by a consolidated management of the old ones unitedly, whilst their distinct corporate entities still remain. It can only be brought about by authority of law. A mere co-operating temporarily in the running of lines and transacting the business of two or more roads does not amount to a consolidation thereof."

The supreme court of Alabama, in *Meyer* v. *Johnston*, 64 Ala. 603, said: "When the rights, franchises, and effects of two or more corporations are, by legal authority and agreement of the parties combined and united into one whole, and committed to a single corporation, the stockholders of which are composed of those (so far as they choose to become such) of the companies thus agreeing, this is in law, and according to common understanding, a consolidation of such companies, whether such single corporation, called the consolidated company, be a new one then created, or one of the original companies, continuing in existence with only larger rights, capacities, and property. Acceptance of this as correct makes it easy to understand that authority given to consolidate 'to such extent, and on such terms, as the parties may agree upon' confers the power to constitute one of the original companies the consolidated company."

From the Alabama court's opinion, Reese on *Ultra Vires* (section 142) has deduced his text, from which we quote: ''The 'consolidation' of a corporation has been defined to be 'a surrender of the old charters by the companies, the acceptance thereof by the legislature, and the formation of a new corporation out of such portions of the old as enter into the new.' The more modern understanding of a consolidation, however, might be better stated by saying that when the rights, franchises and effects of two or more corporations are by legal authority and agreement of the parties combined and united into one whole, and committed to a single corporation, the stockholders of which are composed of those of the companies thus agreeing, this is in law a consolidation, whether the consolidated company be a new one then created or one of the original companies continuing in existence with only larger rights, capacity, and property. 'Amalgamation' has been declared to be when the existing companies agree to abandon their respective articles of association and regulation, and to register themselves under new articles as one body. This would be a new company, formed by the coalition or amalgamation of the companies previously existing. The expression 'amalgamation,' however, is of English origin, has never appealed to the judicial sense of this country, and is seldom used to designate the union of two or more corporations, the word 'consolidation' being the term in common use.''

In *Mackintosh* v. *Flint & P. M. R. Co.*, 34 Fed. 582, the court, recognizing a difference between a purchase and a consolidation, observed: ''Under the general railroad law, companies are allowed to consolidate when they form continuous or connecting lines. This contemplates the formation of a new corporation, and requires the consent of the majority of the stockholders in each company. This statute, however, does not cover this case. This is not to be a consolidation, but a purchase of the latter company's stock, property, and franchises, and to use the same as part and parcel of the purchasing company, and then to bring the acquisition within the op-

eration of its own charter. The consolidation statute does not authorize one company thus to acquire and absorb another."

Elliott on Railroads says: "Ordinarily, the effect of a consolidation is to dissolve the old companies and to form a new one; but this result does not always follow, for it depends largely upon the terms of the consolidation, and the legislative intent as manifested in the statute under which the consolidation takes place; and the constituent companies usually have at least a qualified existence for the purpose of winding up their affairs and preserving the rights of their creditors. The term 'consolidation' is an elastic one, and may include a union of two or more corporations into a new one with a different name, with or without extinguishing the constituent corporations, or the merger of two or more corporations into another existing corporation under the name of the latter. There is, as we have already said, a distinction between these modes of consolidation. In the latter case, if the merger is complete, it is evident that the one corporation is extinguished, unless kept alive for certain purposes, while it is equally clear that the other, in which it is merged, is not dissolved. In other words, the legislative intention in such a case would seem to be to unite the two companies under the old charter of one of them, while statutes authorizing the consolidation of two or more corporations in the ordinary way are generally construed as authorizing the formation of a new and distinct corporation, thus extinguishing all the constituent companies unless a contrary intention is manifest." (Sec. 335.)

Further citations from the great number of cases that we have studied would be superfluous, for they are practically uniform in defining a consolidation of corporations to be a merger, a union, or amalgamation, by which the stock of the two corporations is made one, by which their property and franchises are combined into one; by which their powers become the powers of one, by which their names are merged into one, and by which the identity of two practically, if not actually, runs into one.

Section 911 of the Civil Code of Montana is not merely a

legislative declaration of the manner of consolidation, but serves as a definition as well. It specially provides how two railroad corporations may become one by any name adopted, how their shares may be retired or exchanged for the capital stock of the resultant corporation, how the corporation formed by the consolidation shall succeed to the rights, powers, privileges, franchises, immunities, and property possessed by the corporations so consolidated, etc.

Ordinarily no idea of a lease would ever enter into any explanation of what constituted a consolidation, unless such contract of lease was for so long a period of time, or by its terms was such as to make it a practical merger of one corporation into another. Lease does not imply consolidation, nor consolidation lease. The power to consolidate, as has been seen, is a power to make two corporations one; the power to lease carries with it no power to pass anything except the right to use the property leased. In the lease under consideration there is no merger of ownership, no communion of interest, no distribution of receipts based upon a contingent measure of profits, no common ownership of shares of stock, no joint management, and no yielding up of an independent corporate existence by the lessor to the lessee.

As was said in *State* v. *Vanderbilt*, 37 Ohio St. 590: "Power to lease does not imply the power to consolidate, nor power to consolidate the power to lease. They are distinct and independent powers. Nothing passes under the lease except the right to the use. The lessor retains its existence, and its right to consolidate with connecting lines. There can be no consolidation except as to connecting lines. These connecting lines belong to the lessor companies, but these have not entered into the consolidation."

In *Mills et al., executors*, v. *Central R. of New Jersey*, 41 N. J. Eq. 1, 2 Atl. 453, a question arose involving the power to lease under a power to consolidate. Chancellor Runyon, for the court, expressly held that power to consolidate did not involve authority to lease, and did not enlarge an authority to convey lands, etc., conferred by a charter to a railroad com-

pany. The reasoning of that case was that a power to consolidate is to take in a partner, or to go in as a partner, while power to lease is power to dispose of the whole concern to a stranger. "In a consolidation," say the court, "the stockholders of the respective companies still retain, to a certain extent, control of their corporate property, but by a lease the stockholders of the leasing company part with the control of their corporate property, and hand it over to the others, and abandon their enterprise."

We cannot approve altogether of the reasoning of the chancellor, except as it was applicable to the facts of that case, which involved a railroad lease of 999 years. We are of the opinion that a lease, fair in its terms, for 10 years, in no manner involves an abandonment of a railroad enterprise, or is in fact more than a temporary parting with the control of the lessors' corporate property. Reservations in this lease of the Montana Railway Company to the Butte, Anaconda & Pacific give the lessor corporation right to repossess itself of its property, and to oust the lessee, and terminate the lease, in the event of certain violations of the covenants of the contract. There is nothing contained in its provisions from which an abandonment can be inferred. The case cited is none the less a strong support of the view that the prohibition against a power to consolidate does not include a prohibition of a power to lease when the legislature has clearly authorized such latter power; for, if a lease of 999 years is not a consolidation, *a fortiori*, a lease of 10 years is not.

Distinction has also been made between union and consolidation and purchasing by one railroad corporation of another's property and franchises. By the railroad law of New Jersey power was given to railroad companies to lease their roads to any other corporation, or to unite and consolidate. But the court held, in *Elkins* v. *Camden & Atlantic R. R. Co.*, 36 N. J. Eq. 5, that there could be no purchase of a rival railroad under a power of consolidation, as the powers given did not authorize it.

In *Gere* v. *N. Y. Central, etc., R. R. Co.*, 19 Abbott's

New Cases, 193, we have an adjudication of this important
question directly in point.   The case is of high authority be-
cause of the list of eminent counsel who presented it to the
court.   Gere and others brought an action on their own be-
half and in behalf of all other stockholders of the New York
Central & Hudson River Railroad Company against that cor-
poration and the New York, West Shore & Buffalo Railroad
Company and certain firms to restrain the consummation of a
lease between the railroad companies.   The West Shore &
Buffalo Company was a competing road in all respects for its
entire length.   It attempted to lease its road, property and
franchises to the New York Central Company for the term of
475 years.   The rental consideration was a guaranty of pay-
ment of the principal and interest of certain bonds of the West
Shore road.   The statute of New York authorized any rail-
road corporation to contract with any other railroad corpora-
tion for the use of their respective roads, and thereafter gave
the use of the leased railroad in such manner as might be pre-
scribed in the contract.   The statute then contained these
words:   ''But nothing in this act contained shall authorize the
road of any railroad corporation to be used by any other rail-
road corporation in a manner inconsistent with the provisions
of the charter of the corporation whose railroad is to be used
under such contract.''   By Section 9, of Chapter 917, Laws
of 1869 of New York, railroad corporations were also
authorized to consolidate and merge their capital stock, fran-
chises, and property with the capital stock, franchises and
property of any other railroad, etc.; and it was further pro-
vided that ''no companies or corporations of this state whose
railroads run on parallel or competing lines shall be author-
ized by this act to merge or consolidate.''

    The court, through Kennedy, J., first disposed of the ques-
tion of power to lease by holding that it existed under the
statutes referred to, and then discussed the prohibitory sec-
tion above quoted in the following language:   ''The leasing
of one railroad by another, whether for a longer or shorter
period, is not a merger or consolidation.   The term 'lease'

implies the continued existence of the corporation, the lessor, with all its powers and functions, and all the rights incident to its creation, and it would be a gross misapplication of terms to hold that a leasing or contract for use by one railroad to another is a merger or consolidation of the two roads. I am therefore forced to the position that it—the West Shore road —has the authority to execute the lease, and the New York Central has the power and right to receive the same, and to pay rental for the use thereof; and because said roads are competing roads, there being no statutory inhibition upon that ground, it is not a reason why a lease may not be executed by the one and accepted by the other. Upon the assumption that the legislature has authorized a lease between two roads situated as these two roads are, the question of public policy does not enter into a consideration of the questions involved here. If the power has been granted by the legislature, although it may be deemed unwise, and in this instance dangerous in its execution, the remedy will be found in another department of the government, and is not lodged in the judiciary. Several statutes recognize the right, power and authority of the lessee of a railroad to receive by transfer from the lessor, or other or others owning the same the capital stock in the leased road. (L. 1855, c. 302; L. 1867, c. 254; L. 1883, c. 383.")

Thompson on Corporations, Vol. 5, Sec. 5891, approves of the doctrine of *Gere* v. *N. Y. C. etc. Co.*, *supra*, and says that "a statute prohibiting railroad corporations whose roads run on parallel or competing lines from merging or consolidating does not prohibit one such corporation from leasing its road to another."

As against the right to contract by lease, the learned attorney general relies upon the case of *State* v. *Atchison, etc.*, 24 Neb. 143, 38 N. W. 43. There the question arose of the power of two lines of railway to consolidate, when, after they were consolidated, they would form a continuous line without break of gauge or interruption. It was held that the Atchison & Nebraska Railway, extending from

Atchison, Kan., to Lincoln, Neb., and leased to the Burling-
ton & Missouri River Railroad, did not form a continuous line
with the Burlington & Missouri, and that the case was not
within the provision of the statute authorizing the making of
a lease where the roads of the lessee and lessor will form a
continuous line, and that the lease was, therefore, unauthor-
ized.    After deciding this question, the court, through Max-
well, C. J., proceeded *obiter* to fortify its decision upon the
further ground that the lease was, in effect, prohibited by the
constitutional provision against consolidating railroad corpora-
tions owning parallel or competing lines.    "The word 'con-
solidate,' " said the chief justice, "is here used in the sense
of 'join' or 'unite.'    The constitution aimed at practical re-
sults.    *    *    *    The law cannot be evaded, therefore, by
substituting a lease for a deed of conveyance."    The court
regarded the lease in that case as within the inhibition of the
constitution.    The decision of the Nebraska case was based,
however, upon a construction placed upon an attempt by one
railroad to lease another competing road for a period of 999
years, and what we have said heretofore in relation to the
proper limitations to be put upon the language of Chancellor
Runyon in the New Jersey case is applicable to the Nebraska
decision also.    A lease for 999 years may be properly re-
garded as a joinder or consolidation of two competing rail-
roads; it may be such a lease practically involves the consoli-
dation and control of parallel or competing roads, and neces-
sarily, in effect, operates as a surrender of corporate franchises
by the lessor corporation.    This point was emphasized in the
opinion.    But conceding, for the sake of argument, that the
Nebraska decision is directly in point, its force and effect are
very much weakened by the subsequent decision by the same
court in the same case, reported in *State* v. *Atchison, etc.,
Railroad Co.*, 38 Neb. 437, 57 N. W. 20.    After the first
decision, in 1888, by Chief Justice Maxwell, and after it had
been held that the lease of respondent to the Burlington &
Missouri River Railroad Company should be declared void,
upon a demurrer, respondent answered and negatived all the

allegations of infringement of the provisions of the statutes and constitution of the state of Nebraska. The referee afterwards decided that the roads were not competing roads within the meaning of the constitution, and that, therefore, the lease was valid. The court sustained the lease by a brief opinion. Chief Justice Maxwell, who had written the opinion of the court at the former hearing, dissented, principally upon the ground that the roads were competing roads, and that the lease was a violation of the constitutional provision. His construction of the majority opinion is that it contains an admission that the defendant is a competing line at the most important point on the roads, and upon this admission he says there is no power to declare such consolidation not prohibited by the constitution. The case stands, therefore, as practically overruled by this later decision, for there is no escaping the conclusion made plain by Judge Maxwell that the court has receded from its former doctrine.

*Pearsall* v. *G. N. Railroad Co.,* 161 U. S. 646, 16 Sup. Ct. 705, also cited by the attorney general, involved a proposed arrangement between the Great Northern and Northern Pacific Railway corporations, by which there was to be an organization of a new corporation, which should issue its bonds, payment of which was to be guaranteed by the Great Northern, part of the capital stock to be transferred to the shareholders of the Great Northern; and a traffic contract was to be entered into by which the common earnings were to be divided, and traffic was to be exchanged. The statutes of Minnesota forbid railroad corporations to consolidate with, lease, or purchase, or in any way to become owner of or control, any other railroad corporation, or any stock, franchises, rights, or property thereof, which owns or controls a parallel or competing line. The case was decided upon the theory that the arrangement was a consolidation of two competing corporations. The agreement between them was regarded as nothing less than a purchase of a controlling interest, and as practically contemplating the absolute control of the Northern Pacific by the reorganized corporation. The "ultimate amal-

gamation" seemed apparent to the court, and the statute was held applicable to 'prevent such an amalgamation. The decision affirms our views upon the question of consolidation, but, considering the statute of Minnesota, it has little or no bearing upon the questions involved in this case.

We are not unmindful of the spirit which pervades the more modern constitutions against arrangements between competing lines of railroad which may result in monopolies of traffic, and we are not disposed to yield at all in that rigidity of interpretation which we believe must be placed upon the prohibition of the constitution against consolidation of such roads.   On the other hand there are certain fundamental principles of construction by which courts must be guided in correctly ascertaining the intent of a written constitution.   Judges are not at liberty to declare an act of the legislature void because, "in their opinion, it is opposed to a spirit supposed to pervade the constitution, but not expressed in words."  (Cooley on Constitutional Limitations, p. 204.)  The framers of the constitution are presumed to have employed language with sufficient precision to convey the intent of the instrument framed.  And when they only prohibited consolidation of competing railway lines, we understand the word to have been used in its natural sense, and that the constitution intended what it says; that is, forbids what it has forbidden.   Nor does an apparent impolicy of a statute authorize a court to declare it void.   "When the fundamental law has not limited, either in terms or by necessary implication, the general powers conferred upon the legislature, we cannot declare the limitation under the notion of having discovered something in the spirit of the constitution which is not even mentioned in the instrument."  (*People* v. *Fisher*, 24 Wend. 215.)

There is a conclusive presumption, when a state law is attacked upon the ground that it is void, that it is valid unless the constitution of the state prohibits it.   Before it can be set aside as invalid, we must find that "limitations have been imposed upon the complete power which the legislative department of the state has vested in its creation."  (Cooley on Constitutional Limitations, p. 206.)

It is therefore upon these principles that we have patiently and deliberately considered this case. What exigencies may have arisen which deterred the framers of the constitution from prohibiting reasonable leases by one railroad of another, even though they be of competing lines, it is not for us to say. In Montana, as in many other states, the question of authority for leasing railroads has been left to the legislature, which has in turn exercised its power. The courts cannot determine a policy unless it is fairly to be inferred from the language used. It may have been the belief that excessive restrictions, such as the denial altogether of the power to lease, were unwise, and likely to result in greater harm than good; or it may have been the security felt in the knowledge of the fact that by section 5 of the same article of the constitution, which prohibited consolidation, all railroads are deemed subject to legislative control, and subject to the power of the legislature to regulate and control by law the rates of transportation of passengers and freight by such companies as common carriers from one point to another in the state. Safety against extortion is always guaranteed by this section; and if the two corporations, parties to this contract of lease under consideration, should attempt to charge excessive rates, the power is in the legislature to protect the people. In the particular lease before us, provision is made by covenant against increased rates.

In conclusion, it is our unanimous and mature judgment that, while the constitutional section quoted absolutely prohibits consolidation, whether it be direct or indirect, still the difference between a lease and consolidation is too plain to allow any interpretation being put upon the constitutional section quoted, whereby the power to lease is denied by the prohibition against consolidation.

It is unnecessary to dwell upon the latter clause of section 6, Article XV of the constitution, heretofore quoted, by which one railroad shall not unite its business, etc., with the business of another railroad, as we are all of the opinion that it cannot be applied at all to the case before us, but pertains to different conditions.

The petition is denied.                    *Petition denied.*

PEMBERTON, C. J., and PIGOTT, J., concur.