(No. 20375.—

CARL L. GUNGGOLL, *et al.* Appellants, *vs.* THE OUTER DRIVE ATHLETIC CLUB *et al.* Appellees.

*Opinion filed June 24, 1932—Rehearing denied October 5, 1932.*

MAXIMILIAN J. ST. GEORGE, (FRANKLIN J. STRANSKY, of counsel,) for appellants.

GANN, SECORD & STEAD, and WALTER E. BEEBE, (LOY N. McINTOSH, R. V. FLETCHER, and IRWIN ROOKS, of counsel,) for appellees.

Mr. JUSTICE DUNN delivered the opinion of the court:

This is an appeal by the complainants from a decree of the circuit court of Cook county which dismissed for want of equity a bill in chancery which prayed for an injunction restraining the paying out, transfer or disposition of any funds of the Midway Athletic Club, and the transfer, incumbering, hypothecation or disposition of any of its assets and a certain consolidation of the Midway Athletic Club with the Cambridge Club, for an accounting of certain defendants and the Midway Athletic Club, the setting aside of a certain warranty deed of the Midway Athletic Club dated November 1, 1929, purporting to convey certain real estate to the Outer Drive Athletic Club, for the calling of a special meeting of the Midway Athletic Club for the purpose of electing directors, and for general relief. The complainants in the bill as originally filed were nine members of the Midway Athletic Club suing for themselves and for

any other members of the club wishing to join them. They were later joined by 137 other members as complainants, and the name of one member was stricken as complainant, leaving 145 complainants. The defendants were the Outer Drive Athletic Club, the Cambridge Club and the Midway Athletic Club, all corporations not for pecuniary profit under the laws of the State of Illinois, and the persons who had been acting as directors and officers of the Midway Athletic Club.

The Midway Athletic Club was organized on January 25, 1924, having for its object "the benefit of business and professional men, their families and friends, also business and civic meetings, social activities and athletic resources," and its management was vested in a board of five directors. On November 1, 1929, it had 1204 members, of whom 869 were life members, 230 charter members and 105 resident members. In addition 831 persons had applied for membership and each had paid with his application a part of the $400 membership fee and tax. His becoming a member was dependent on his election by the club and payment of the rest of the fee and tax. On November 1, 1929, the club owned three vacant lots on Stony Island avenue and the Midway, in Chicago, of the value of $450,000, which it had bought on July 28, 1924, on which to erect a building for its purposes, it had $143,369.31 on deposit in various banks in Chicago, and it had $232,685 of other assets, the whole amounting, after deducting its liabilities, ($454.88) to $871,256.96. These assets had been derived from the sale of memberships, of which there were three classes: life, charter and resident. The life membership certificates contained the following conditions: "This membership is transferable for a cash consideration or by heritage to an eligible candidate, and shall be forever free and exempt from any and all dues and assessments, and is issued as having been fully paid and non-assessable. This certificate is evidence of membership title and carries with

it prorated undivided interest in the ownership of all assets of the Midway Athletic Club of Chicago, based upon the total number of life members authorized by the by-laws of the club in force and effect as of the date of the opening of the club house." The club had no club building or rooms for the use of its members and had not sufficient funds to erect a suitable building. Its life members, who constituted a large part of its total membership, were not required to pay dues, and its prospective income was not sufficient to justify a loan to it of enough money to erect a suitable building.

The Cambridge Club was organized for a similar purpose to that of the Midway Club and in the summer of 1929 was occupying the Sisson Hotel, No. 1725 East Fifty-third street, having a contract of purchase of the hotel and vacant property adjoining for $2,100,000, upon which it had paid $260,000, and its total assets were $2,497,746.37. Its surplus of assets over liabilities was $498,150.60.

On August 4, 1929, committees severally appointed by the Cambridge Club and the Midway Athletic Club made a joint report to the two clubs, in part as follows: "The committee unanimously recommends the consolidation of the Midway Athletic Club and the Cambridge Club under the following conditions: (1) That the new club be incorporated under some appropriate name to be determined later; (2) that each member of the two clubs will receive a membership in the new club in the same class he now holds in the present clubs; (3) that the life memberships in the new club, at the discretion of the board of directors, will be subject to a service charge of $60 a year for a maximum period of ten years; the committee is convinced that if this is done a satisfactory budget will result, as shown in exhibit 'A;' (4) that the new club will acquire all of the assets of the present clubs in exchange for the memberships issued to the members of the present clubs as provided for in paragraph 2; (5) that the funds realized

from the present assets of the Midway Athletic Club be used solely for the purpose of acquiring land south of the present club house of the Cambridge Club and erecting athletic facilities thereon in accordance with the financial plan shown in exhibit 'B.' The committee further recommends that if this report be approved by the board of governors of each club a joint meeting of the two boards be held to consider certain questions before the consolidation is submitted to the members of the two clubs for approval. At this meeting committees can be appointed to deal with various matters which will need early consideration."

In accordance with this report, G. G. Dowdall, who was president of the Midway Athletic Club, sent a notice to each member of the club of a meeting to be held on October 1, 1929, at eight o'clock P. M., at the Cambridge Club, 1725 East Fifty-third street, and a proxy to the officers of the club, with a request that it be signed and sent to the office of the club. These were inclosed in a letter of the president strongly urging the prompt return of the card and setting forth at some length the reasons for taking the action recommended by the committee. It was stated that the members of the Cambridge Club would meet on September 27 to vote on the consolidation of the two clubs and the meeting of the members of the Midway Club would be asked to vote in favor of the consolidation of the two clubs. The meeting was held on October 1, but as no quorum of the members was present it adjourned without taking any action. Another meeting was called for November 1, of which notice was given, and a meeting was held at that time at which a resolution was offered and seconded purporting to authorize the proper officers of the club to sell, assign, transfer and convey to a corporation not for profit, organized under the laws of Illinois, to be known as Outer Drive Athletic Club, or by some other appropriate name, all of the real estate, buildings, machinery, furniture and fixtures, hotel equipment, and all other per-

sonal property belonging to the Midway Athletic Club; also all bills, accounts receivable, credits, good will and other property possessed, owned, controlled or claimed by Midway Athletic Club, at and for the value thereof, as shown by the books of the club as of the close of business on November 1, 1929, subject to the newly organized club assuming and paying all the outstanding liabilities as shown on the books of the Midway Athletic Club as of said date, and subject to the newly organized club transferring and assigning to the Midway Athletic Club, or its order, memberships from its unissued memberships sufficient to provide one certificate of appropriate class for each such certificate outstanding and issued by the Midway Athletic Club, and subject to the Outer Drive Athletic Club making and complying with other provisions more particularly set out in detail in a certain offer of agreement dated the 13th day of August, 1929, addressed to the Midway Athletic Club and to the Cambridge Club, which offer or agreement was accepted and approved. The vote was taken and the result was announced by the secretary as 631 for the resolution, 617 by proxy and 14 present in person, and 53 against the resolution, seven by proxy and 46 present in person. The Midway Athletic Club by its proper officers immediately executed a warranty deed dated November 1, 1929, and filed for record the next day, conveying the three lots at Stony Island avenue and the Midway to the Outer Drive Athletic Club, which in a few days changed its name to the Beachview Club. Many of the members of the Midway Athletic Club have surrendered their certificates of membership for certificates of membership in the Beachview Club.

Counsel on each side have argued at some length the question whether the transaction by which the property of the two clubs passed to the third club was a sale or a consolidation. The matter of the name by which the parties refer to the transaction is not so important as the character of the transaction itself. The joint committee of the two

clubs certainly thought it was recommending a consolidation. President Dowdall certainly left no doubt in the minds of the readers of his letter that he was recommending a consolidation as the source of the many advantages which he believed would follow, and there is no reason to suppose that any of the members who signed the proxy authorizing the voting of their certificates believed that anything other than a consolidation was contemplated. What any of them thought about the effect of the action proposed is, however, not very material. The question is what was the legal effect of the things done.

Considering the legal effect of the performance of the proposed contract, the transaction was, in fact, a consolidation, and not a sale, as the appellees insist. The Outer Drive Athletic Club had no assets with which to buy anything. It was without money or property of any kind and without members. When the transaction as contemplated should be completely accomplished both the Midway Athletic Club and the Cambridge Club would be left without money or other property and without members, while the Outer Drive Athletic Club, which before the meeting of November 1, 1929, had only its charter, three directors, no members, no applications for membership, no money and no other property, immediately after the meeting had all the money and assets of both the other clubs. The Midway Athletic Club and the Cambridge Club when the meeting of November 1, 1929, began had about 2900 members and applicants for membership, the three lots on Stony Island avenue and the Midway, valued at $450,000, a contract for the purchase of the Sisson Hotel, (which was subject to a mortgage of $1,100,000) for $2,100,000, furniture and fixtures $284,-896.60, and $148,000 in cash, $271,440 subscriptions, and other smaller items, which brought the assets of the two clubs up to $3,369,458.21 with liabilities of $2,000,050.65, showing the net worth of the two clubs $1,369,407.56, the Midway Club's net worth being $871,256.96 and the Cam-

bridge Club's $498,150.60. This was neither a sale nor an exchange of property. It was simply an effort on the part of the two clubs, the Midway and the Cambridge, to strip themselves of their property and get rid of their responsibility and liabilities, while the Outer Drive Athletic Club took all the property of both the other clubs, all their members, all applications for membership and assumed all their debts and liabilities. There was nothing left for the original clubs to do. The Outer Drive Athletic Club was entirely substituted in place of the other two clubs. This is what happens when two corporations consolidate.

A consolidation of corporations has been defined to be a merger, a union or an amalgamation by which the stock of the two corporations is made one, by which their property and franchises are combined into one, by which their powers become the powers of one, by which their names are merged into one, and by which the identity of two practically, if not actually, runs into one. This was the definition formulated by the Supreme Court of Montana after an exhaustive examination of a great many adjudicated cases and text books and a consideration of a large number of constitutional and statutory provisions of the different States, in *State* v. *Montana Railway Co.* 21 Mont. 221.

. In *Chicago, Santa Fe and California Railway Co.* v. *Ashling,* 160 Ill. 373, the railway company was sued in an action of debt upon a judgment against the Chicago and St. Louis Railway Company upon the alleged ground that the two railway companies had become consolidated. There was no controversy of fact in the case, and the issue of law between the parties was whether the transaction between the Santa Fe company and the St. Louis company was a consolidation or a sale by the St. Louis company of all its property, rights and franchises to the Santa Fe company. It was contended by the Santa Fe company, the plaintiff in error, that the transaction was sufficiently shown to have been a purchase and sale by the deed of conveyance of the St. Louis com-

pany and by the resolutions adopted by the respective boards of directors and meetings of the stockholders of the two companies and by reason of the fact that no certificate of consolidation was filed in the offices of the Secretary of State and recorder of deeds, as required by the act of 1872, and that the notices required by the act of 1885, and not by the act of 1872, were given, no attempt having been made to comply with the act of 1872. The court in its opinion said that the proceedings of the two corporations were had under the act of 1885, which authorized the purchase, upon certain conditions, by one railroad company of another of the railroad lines of that other, rather than under the act of 1872, which authorized the consolidation of incorporated companies, but it held that since all the stockholders were present at the meetings it was immaterial whether the proper notices were given or not. It was further held that the suit not being a direct proceeding to test the right of the Santa Fe company to hold the franchises and property of the St. Louis company and to assert its corporate rights and franchises, and, whether the transaction between the two companies amounted to a consolidation of the St. Louis company with the Santa Fe company, the latter could not in that proceeding be heard to say that it did not comply with the requirements of the statute but is estopped from doing so. It was said that "it is true that what was done must be considered in order to determine whether there was a consolidation or not, but we must look to the results accomplished, rather than to the means, steps or procedure by which those results have been attained." The fact was then referred to as going far toward stamping the transaction as one of consolidation, that in addition to the consideration of one dollar to be paid by the Santa Fe company and the assumption and payment of the bonded indebtedness of the St. Louis company, the Santa Fe company was to issue its stock to the stockholders of the Santa Fe company, dollar for dollar, in exchange for its

stock in the latter company. The effect of this was to incorporate in the Santa Fe company the stockholders of the St. Louis company, combining all the stockholders of each company in one. "This," the court said, "was an act of consolidation and not by any means necessary to a mere purchase and sale. * * * By the transaction the St. Louis company was left without property, corporate rights or franchises of any kind, and without stockholders. All of these were transferred bodily to the Santa Fe company, and became united, respectively, with the property, rights, franchises and stockholders of the latter company. Why was this not a consolidation of the St. Louis company with the Santa Fe company? There is no magic in words. Merely calling the transaction a purchase and sale would not prevent it from being a consolidation. It cannot be supposed from the nature of this transaction that it was expected that the St. Louis company should continue its active corporate existence after divesting itself of all its property, corporate rights and franchises and stockholders."

In the case cited there was a statute which authorized the consolidation of the two corporations and prescribed the manner in which it might be accomplished, and an effort in good faith to consolidate the two corporations which was insufficient to create a new corporation *de jure* because of a failure to comply in some particular with the requirements of the law in respect to the consolidation would still establish a corporation *de facto,* not subject to collateral attack but only subject to direct attack by the people by *quo warranto.* It was further held, as has been stated, that the Santa Fe company could not in that collateral proceeding be heard to say that it did not comply with the requirement of the statute and the consolidation was therefore void, but was estopped to do so. In this case there was no statute authorizing the two corporations to consolidate. The consolidation was therefore without authority and void, and the doctrine of the *de facto* corpora-

tion, which is based on an attempt in good faith to organize under a valid law, has, therefore, no application.

Corporations cannot consolidate without statutory authority, and the rule applies to corporations not for pecuniary profit to the same extent as to other corporations. All alike have their franchise of existence as corporations and of exercising the powers and authority granted in their charters by virtue of statutes, and they derive all their powers from the legislature, which may restrict those powers within such limits and impose such terms as it deems proper. (*American Loan and Trust Co.* v. *Minnesota and Northwestern Railroad Co.* 157 Ill. 641; *Scheidel Coil Co.* v. *Rose,* 242 id. 484; *Chicago Title and Trust Co.* v. *Doyle,* 259 id. 489; *Chicago Title and Trust Co.* v. *Zinser,* 264 id. 31.) In the first of these cases there had been an attempted consolidation of the Chicago, Freeport and Northwestern Railroad Company, organized under the laws of this State, with a railroad company of the States of Wisconsin and Minnesota, formed under the statutes of those two States by the consolidation of the Chicago, Freeport and St. Paul Railroad Company, organized under the laws of Wisconsin, and the St. Paul, Minneapolis and Chicago Railroad Company, organized under the laws of Minnesota, the consolidated company so formed taking the name of Chicago, Freeport and St. Paul Railroad Company. At the time of this attempted consolidation of the corporation so formed with the Illinois corporation there was no statute of this State authorizing railroad corporations of this State to consolidate with railroad corporations of other States. After the attempted consolidation the supposed newly formed consolidated company, which was known as the Chicago, Freeport and St. Paul Railroad Company, executed a trust deed on April 10, 1884, to the American Loan and Trust Company to secure the payment of $10,000,000 of first mortgage bonds, which covered all the lines and property of the railroad company, both present and after-acquired, in Illinois, Wis-

consin and Minnesota, and was recorded in the counties of Cook, DuPage, Kane, DeKalb, Stephenson and Ogle. Only $160,000 of the bonds secured by the trust deed were issued. These were held by innocent purchasers for value, and none of the interest coupons which were past due had been paid. Between May and December 30, 1885, the consolidated Chicago, Freeport and St. Paul Railroad Company procured right of way contracts from forty-eight land owners, covering about eighteen miles of right of way from Maywood, in Cook county, to the Fox river at St. Charles, in Kane county, and shortly after these contracts were obtained they were recorded in the respective counties of Cook, DuPage and Kane. About 1854 an Illinois corporation organized for the purpose of constructing a railroad called the St. Charles Air Line, procured a right of way one hundred feet wide through Cook, DuPage and Kane counties to the west bank of the Fox river and partially constructed the road-bed but in 1855 abandoned the right of way and road-bed, and the former owners of the land resumed possession and thereafter occupied the land and claimed ownership uninterruptedly for twenty years. In March, 1886, the board of directors of the Chicago, Freeport and St. Paul Railroad Company adopted and laid out its line of railroad one hundred feet wide upon the old road-bed of the St. Charles line from a point at the city limits of Chicago at a place called Maywood, to the west bank of the Fox river at St. Charles, in Kane county. In February, 1886, the Minnesota and Northwestern Railroad Company was incorporated under the laws of Illinois to construct a railroad from Chicago to East Dubuque, in Jo Daviess county, and in April, 1886, made a survey over the same line as that of the Chicago, Freeport and St. Paul Railroad Company—that is, over the old St. Charles line from Maywood to the west bank of the Fox river at St. Charles. Before making its survey it was notified that the other railroad company had already surveyed and located

its railroad on that line and had procured contracts for the right of way but that deeds had not yet been made. The Minnesota and Northwestern Railroad Company employed the former attorney of the Chicago, Freeport and St. Paul Railroad Company who had procured the right of way contracts for the latter company, to obtain the execution of deeds to the former company of the same lands described in the right of way contracts and for the same consideration stated in those contracts. The attorney obtained the deeds, most of the land owners supposing they were executing the deeds called for by the terms of their respective right of way contracts. The Minnesota and Northwestern Railroad Company entered into possession of the lands, constructed its railroad from Chicago to East Dubuque, and was in possession of and operating the railroad when the bill was filed by the American Loan and Trust Company, as trustee in the deed of April 4, 1884, for its foreclosure. In the meantime the Minnesota and Northwestern Railroad Company had executed on December 27, 1886, a trust deed conveying to trustees, to secure a bond issue of $8,000,000, its entire railroad, extending from Chicago to Dubuque. The Minnesota and Northwestern Railroad Company, the Chicago, Freeport and St. Paul Railroad Company, the Chicago, Freeport and Northwestern Railroad Company, and the trustees under the trust deed of the Minnesota and Northwestern Railroad Company dated December 27, 1886, were all made defendants to the bill of the American Loan and Trust Company to foreclose the trust deed of April 4, 1884. All of the facts recited appearing on the face of the bill, the circuit court sustained a demurrer to it and dismisstd it for want of equity. In the opinion of the court affirming the decree it is said that the principal contention of the appellant was that any attempt at consolidation by a corporation of Illinois, when not questioned by the State itself, is good as against third persons, and especially wrongdoers, but that the claim was too broad.

At page 651 it is said: "Corporations cannot be consolidated without express sanction of the State. But this sanction may be either by authority given in a general law, by the special charters of the consolidating companies, by a statute passed before consolidation, or by a subsequent legislative ratification of an unauthorized consolidation. (4 Am. & Eng. Ency. of Law, pp. *272i, 272k,* and notes; *Pearce* v. *M. & I. R. R. Co.* 21 How. 441; *Clearwater* v. *Meredith,* 1 Wall. 25; *N. Y. & S. C. Co.* v. *Fulton Bank,* 7 Wend. 412.) And if the power to consolidate with other railroads is withheld, it is regarded as a prohibition against the exercise of such a power. (3 Wood on the Law of Railroads, sec. 486.) The rule of the law, instead of being as broad as is claimed by appellant, may be stated thus: Where there is a *de facto* corporation, its corporate existence, except in a few exceptional cases, cannot be questioned collaterally, and can only be inquired into by the State and in a direct proceeding. (*Hudson* v. *Green Hill Seminary,* 113 Ill. 618.) But in order that there should be a *de facto* corporation two things are essential: First, there must be a law under which the corporation might lawfully be created; and second, user. Where the law authorizes a corporation and there is an attempt in good faith to organize, and corporate functions are thereupon exercised, there is a corporation *de facto,* the legal existence of which cannot ordinarily be questioned collaterally. This is not only the doctrine of *Hudson* v. *Green Hill Seminary, supra,* but of numerous other decisions in this court." The opinion then cites and discusses authorities in support of the principle that there can be no *de facto* corporation where there is no statute under which the power assumed may lawfully be created; that the mere assumption of power to act, even in the full belief that the attempted incorporation is legal, would not constitute a corporation *de facto;* that a body which cannot become a corporation *de jure* cannot legally become a corporation *de facto,* and

that in all cases where a corporation *de facto* is claimed to exist there must be a law authorizing a corporation *de jure* and an attempt in good faith to comply with it.

In *Chicago Title and Trust Co.* v. *Zinser, supra,* it is held to be a foundation rule that either consolidation, purchase or merger of corporations must have statutory authority; that the General Assembly may authorize the merger of one corporation into another and the continued existence of the latter; that in case of a consolidation, it may result, on account of the territorial jurisdictions of different States, that each of the constituent corporations, as a matter of law, remains in existence in a certain sense and a new corporation is created, as in the case of interstate corporations, but that in the case of a statute which simply provides for the consolidation of domestic corporations the original corporations cease to exist and a new corporation is created, with all the property, effects, rights and franchises held and enjoyed by either of the old corporations.

There is no statute of this State which authorizes the consolidation of corporations not for pecuniary profit, and without such statute the power is forbidden. The negotiations between the Midway Athletic Club and the Cambridge Club were for a consolidation, and, independent of the use of the word "consolidation," the carrying into effect of the agreement reached would result in the combination of the property rights and franchises of the two corporations into one, the Outer Drive Athletic Club, which by its change of name has become the Beachview Club, in which the identity of the two original corporations would be merged. The agreement, under the decisions cited, is therefore void. This question goes to the foundation of the controversy, and in view of the conclusion we have reached other questions whch have been discussed are not material to the present controversy.

We are asked by counsel for the appellants to give our opinion on other points raised in the briefs: the amendment of the charter and number of directors the Midway Athletic Club may legally have; the legality of the various boards of directors and the by-laws; what class of members and subscribers had the right to vote, and the manner of voting, on a consolidation or sale of all the assets; in whom is the title of the assets, real and personal; the right to modify, by by-law or resolution, the contracts of members or subscribers without their consent, and the question whether the contract for the purchase of the Sisson Hotel is *ultra vires*. These questions are interesting, but it is not necessary to write a treatise on the law of corporations not for pecuniary profit under the statutes of Illinois in order to decide this case. The one question necessary to decide in this case is whether the contract between the Midway Athletic Club and the Cambridge Club was a contract of consolidation or not. If it was, then under the decisions which have been cited it was void and the decree of the circuit court must be reversed and relief granted to the complainants. If it was not, then other questions might require consideration. Since we have decided that the contract was one of consolidation, it is not necessary to decide all the other questions which would otherwise have required consideration and perhaps not proper to decide some of them.

The deed of the Midway Athletic Club to the Outer Drive Athletic Club must be set aside and the money paid or transferred must be re-paid.

The decree of the circuit court is reversed and the cause is remanded to the circuit court, with directions to grant the relief prayed for in accordance with the views expressed in this opinion so as to restore the Midway Athletic Club to the condition in which it was on November 1, 1929.

*Reversed and remanded, with directions.*